IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID G. LEONARD,

                          Petitioner,

                vs.

TIM PEREZ, Warden,
California Institution for Men,[1]

                          Respondent.

No. 2:12-cv-02161-JKS

MEMORANDUM DECISION

David G. Leonard, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Leonard is in the custody of the

California Department of Corrections and incarcerated at the California Institution for Men.

Respondent has answered, and Leonard has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On October 3, 2008, Leonard was charged with seven counts of committing a lewd or

lascivious act upon the body of a child under 14 years of age (counts 1, 2, 4, 5, 6, 7, 8) and one

count of committing a forcible lewd or lascivious act upon the body of a child under 14 years of

age (count 3).  As to counts 3 and 4, the indictment further alleged that Leonard was not eligible

for probation because he used force, violence, duress, menace, or fear of immediate and unlawful

bodily injury on the victim during the commission of the crimes.  As to counts 5, 6, 7, and 8, it

alleged that Leonard committed the crimes against more than one victim.  On direct appeal of his

---

[1]        Tim Perez, Warden, California Institution for Men, is substituted for James
Hartley, former Warden, Avenal State Prison.  FED. R. CIV. P. 25(c).

conviction, the Court of Appeal recounted the following facts and evidence underlying the

charges against Leonard:

> The victim was S.M., whose birth date is in September 1990.  At the time of the alleged molestations, S.M. lived with his mother, C.M. (mother), and his brother, M.M.
>
> S.M. was nearly 11 years old when he first met [Leonard] in the summer of 2001 while attending Camp Bushido, a judo summer camp, that [Leonard] ran.  The next summer, S.M. returned to the camp, after [Leonard] had called mother and requested S.M.'s presence.  Mother accompanied S.M. to the 2002 camp and became friends with [Leonard].
>
> Mother's family and defendant then exchanged several visits over the next two and a half years, and S.M. sometimes stayed alone with [Leonard].
>
> The principal evidence against [Leonard] consisted of the following categories: S.M.'s statements to law enforcement, S.M.'s trial testimony, two pretext phone calls between S.M. and [Leonard], two searches of [Leonard's] residence, and evidence involving another alleged victim of [Leonard's], J.L.  The catalyst for this evidence occurred when S.M., having "to get it off [his] chest," reported the molestations to his school counselor in January 2006.
>
> [Leonard] countered this evidence with his own testimony, as well as evidence covering alibi, a psychological profile, and his good character.  We will summarize this evidence now, using these categories.[2]
>
> > FN2.   Based on S.M.'s testimony before a grand jury, [Leonard] was indicted on four counts against S.M., occurring between July 2002 and January 2004 and charged as follows: count 1, "first incident"; count 2, "final incident"; count 3, "first incident with force"; and count 4, "final incident with force."  Count 3 alleged a violation of Penal Code section 288, subdivision (b)(1), while the other three counts alleged section 288, subdivision (a) breaches.
> >
> > [Leonard] was also indicted on four counts against J.L., but those charges were dismissed as to Sutter County on venue grounds.
>
> ***S.M.'s Statements to Law Enforcement***
>
> In February 2006, S.M. told a forensic interviewer that he was first molested at [Leonard's] house after the third year at judo camp.  Among other acts, S.M. stated that [Leonard] had sodomized him and had molested him on the floor.
>
> In October 2006, Detective David Marshall interviewed S.M.  Using a list of visit dates with [Leonard] that mother had compiled from her old calendars, S.M. stated that [Leonard] first molested him in July 2002 when S.M. stayed with [Leonard] following his second judo camp.  [Leonard] pulled S.M. from the bed to the floor and sodomized him. S.M. then told Detective Marshall of the following additional incidents:

In October 2002, after "bear-hugg[ing]" S.M., [Leonard] pulled S.M. to the bedroom floor, forced his ([Leonard's]) penis into S.M.'s mouth and sodomized S.M.

In December 2002, [Leonard] sodomized S.M. and had S.M. sodomize him while mother was apparently asleep in the next room.

In January 2004, [Leonard] touched S.M. while they were in S.M.'s kitchen.

### *S.M.'s Trial Testimony*

S.M. testified that, following the judo camp in the summer of 2002 or 2003, he stayed alone with [Leonard] at [Leonard's] house for about two weeks. Another boy, J.T., stayed at [Leonard's] house for about two days.

During this two-week period, [Leonard] sexually molested S.M. about five or six times.

The first incident occurred around the fourth night that S.M. was there. [Leonard] summoned S.M. to his bedroom, showed him a pornographic movie, and then masturbated in front of S.M., telling the boy to "do it" to [Leonard]. The ordered masturbation eventually ensued, with [Leonard] finishing the job on his own and ejaculating onto the floor.

A few nights later, [Leonard] sodomized a shocked and kneeling S.M. on the floor in front of [Leonard's] bed while holding S.M. by the waist and using a lubricant jelly.

On still another occasion during this fateful stay, [Leonard] had S.M. orally copulate and sodomize him while the two wore only shirts.

Between the ages of 11 and 14, S.M. estimated that he visited at [Leonard's] house about 20 times. Three or four times, mother and his brother also visited. When they did so, mother would stay in one of the two guest rooms with S.M., which had two beds, and his brother would stay in the other. After mother and his brother fell asleep, [Leonard] would direct S.M. to [Leonard's] bedroom. From the first to the last of these visits, [Leonard] molested an unwilling S.M. The last touching took place in S.M.'s kitchen when S .M. was finally able to ward off [Leonard's] advances. In the summer of 2005, S.M. begged mother not to send him to Camp Bushido.

S.M. testified that, overall, at [Leonard's] house: [Leonard] masturbated in front of S.M. about five to six times, and S.M. masturbated [Leonard] on two or three occasions; [Leonard] sodomized S.M. about 12 to 15 times, and had S.M. sodomize him about seven or eight times; and [Leonard] orally copulated S.M. twice and made S.M. return the "favor" twice. Also twice, [Leonard] physically restrained S.M. while sexually assaulting him, but it was clear that S.M. could not stop any of the molestations because [Leonard] was a grown man and S.M. just a boy.

S.M. did not tell mother about [Leonard's] sexual molestations because she would then feel she had "let [S.M.] down"; mother had wanted [Leonard] to be a "father figure" for her two sons, and she had discussed S.M.'s behavioral problems with [Leonard].

Finally, S.M. was able to accurately describe [Leonard's] unusual penis, which curved to the left, more noticeably so when erect (Detective Marshall testified that when

3

he asked [Leonard] if there was any legitimate way that S.M. could have known this, [Leonard] replied, "not to that detail").

### Two Pretext Phone Calls

Directed by the police, S.M. made two pretext phone calls to [Leonard], the first in July 2006 and the second the following month.

In the July 2006 call, [Leonard] advised S.M. that S.M. was "not gay" because of what the two of them had done together–they had just "experimented."  [Leonard] added that if given the chance, he might do it again with S.M.  When S.M. asked if he (S.M.) was the only male [Leonard] had had sex with, [Leonard] replied he had experimented a little bit when he was younger.

In the August 2006 call, [Leonard] told S.M. to be "real careful" about what he told his school counselor about what they had done together.  [Leonard] told S.M. not to disclose their age differences, but to tell the counselor he had "experimented" with someone his own age.  The counselor was a "mandated reporter," [Leonard] informed S.M., and disclosing what had happened would mean a "very good possibility" that [Leonard] would go to jail.

### Two Searches of [Leonard's] Residence

In September of 2006 and again the next month, the police searched [Leonard's] residence.

During the September 2006 search, police found three Hispanic boys (eight to 12 years old) on the premises and, among other items, many photographs of other boys (including a framed photograph of [Leonard] with his arm around S.M.), and a laptop computer.  The laptop contained several video clips showing the genitalia of one of the three Hispanic boys who was there, as well as an additional 93 pictures of naked boys.

When officers conducted the second search, in October 2006, [Leonard] was not at home.  However, a computer "eraser" program was running, which the officers aborted.

### Evidence Involving Another Alleged Victim, J.L.

J.L.'s mother testified that she and her husband used [Leonard] for overnight respite care for their son, J.L., on approximately five occasions from fall 2002 into the summer of 2003 when J.L. was seven to eight years old.  In October of 2006, J.L. told his parents that [Leonard] had molested him.

J.L., who was 14 years old at the time of trial, testified that [Leonard] sexually molested him during the second and third weekends that he stayed at [Leonard's] house.

During the second weekend, [Leonard], overriding J.L.'s objection, got into the bathtub with J.L. and rubbed J.L.'s penis.

On the third weekend, [Leonard] touched J.L.'s penis, had J.L. sit on him after he ([Leonard]) removed his pants, and had J.L. rub his penis between [Leonard's] legs.  J.L. asked why [Leonard's] penis was crooked.  Someone then knocked on the door, and [Leonard] told J.L. to hide.  [Leonard] also told J.L. not to tell anyone about the touching, or J.L. would get in trouble.

4

### *[Leonard's] Testimony*

[Leonard] acknowledged many of his visits with S.M. and S.M.'s family, disputed others, and denied having any sexual contact with S .M. between July 2002 and January 2004, as charged in the indictment.

When S.M. brought up sexual conduct in the pretext phone calls, [Leonard] thought S.M. was talking about a past incident in which S.M. and an older boy, D.S., had masturbated themselves. Consistent with his training about counseling individuals in crisis, [Leonard] "fed back" S.M.'s statements, and was trying to let S.M. know that it was normal to experiment sexually while growing up. However, [Leonard] acknowledged telling S.M. that S.M. was "not gay" because the two of them had had sex together, that they had experimented, and that [Leonard] might want to do it again.

### *Alibi Evidence*

J.T., a "long-term" family friend of [Leonard's], testified that after Camp Bushido in 2003, he and S.M. stayed with [Leonard] at [Leonard's] house. S.M. stayed three days, while J.T. remained for about eight. J.T. said S.M. got homesick and called his mother to go home. J.T. never saw S.M. spend the night in [Leonard's] bedroom–the two boys slept in the guest bedroom in two twin beds, and S.M. was there whenever J.T. awoke.

One of three Hispanic boys at [Leonard's] residence during the first search testified that, as a joke, he took the video clip of his naked brother during a camping trip, and inadvertently downloaded the clip onto [Leonard's] laptop computer.

### *Psychological Profile and Good Character Evidence*

Dr. Don Siggins, a psychologist, examined [Leonard]. The doctor opined that [Leonard's] psychological profile was inconsistent with that of a child molester or pedophile.

This psychological evidence was buttressed anecdotally by several friends and family members of [Leonard], who testified to his good character and their belief that he would not act inappropriately with children.

*People v. Leonard*, No. C064667, 2011 WL 1833262, *1-4 (Cal. Ct. App. May 13, 2011).

On January 9, 2009, the trial court granted Leonard's motion to dismiss counts 5 through 8, the counts relating to J.L., on the ground that the prosecutor failed to present evidence to the grand jury that those counts took place in Sutter County. Leonard subsequently proceeded to jury trial on June 2, 2009. On June 18, 2009, the jury found Leonard guilty of the remaining counts (counts 1 through 4) and found true the attached allegations. The trial court then

sentenced Leonard to an aggregate term of 14 years' imprisonment, consisting of 8 years for count 3 and 2 years each for counts 1, 2, and 4.

Through counsel, Leonard appealed his conviction, arguing that 1) the trial erred when it denied Leonard's motion to require the prosecution to elect a specific act for each of the four counts that went to trial; 2) the trial court erred when it denied Leonard's motion for a mistrial based on juror misconduct; 3) the trial court erred in admitting the testimony of J.L.; and 4) the verdict was unsupported by legally sufficient evidence because S.M.'s "generic" testimony did not meet the standard of *People v. Jones*[2] and was "inherently improbable."  On May 13, 2011, the Court of Appeal issued a reasoned, unpublished opinion affirming the judgment against Leonard in all respects.  *Leonard*, 2011 WL 1833262, at *11.  Leonard petitioned for review in the California Supreme Court, raising the same claims he unsuccessfully raised before the Court of Appeal.  The Supreme Court denied review without comment on August 17, 2011.

Leonard timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on August 17, 2012.  On the same day, Leonard moved to stay and abey the federal proceedings to

---

[2]    *See People v. Jones*, 792 P.2d 643 (Cal. 1990).  *Jones* developed the level of specificity needed to provide sufficient evidence in abuse cases involving generic testimony:

> The victim, of course must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct . . . .  Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment . . . .  Finally, the victim must be able to describe *the general time period* in which these acts occurred . . . to assure the acts were committed within the applicable limitation period.  Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction.

*Id.* at 655-56.

6

allow him to pursue in state court the unexhausted claims addressed in the petition.  This Court, through a previously-assigned judge, denied the request and allowed Leonard to file an amended petition containing only exhausted claims.  Leonard's case was subsequently transferred to the undersigned judge, and his amended petition at Docket No. 35 ("Amended Petition") is now before this Court for disposition.

## II. GROUNDS/CLAIMS

In his *pro se* Amended Petition before this Court, Leonard raises four grounds for relief, asserting the same claims he unsuccessfully raised before the state courts on direct appeal.  First, Leonard argues that the prosecution gave him insufficient notices of the charges against him because it failed to elect a specific act for each of the four counts that proceeded to trial. Leonard next contends that reversal of his conviction is warranted because the jurors committed misconduct by ignoring the requirement that they unanimously agree as to the act that constituted a violation of each count.  Third, Leonard asserts that the testimony of J.L. was "so prejudicial and inflammatory that it rendered his trial fundamentally unfair."  Finally, Leonard claims that the evidence was legally insufficient to support the guilty verdict.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).   Under the AEDPA, the state court's

findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear

and convincing evidence.   28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003).

Leonard has not replied to Respondent's answer.   The relevant statute provides that "[t]he

allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."   28 U.S.C. § 2248; *see also Carlson v.

Landon*, 342 U.S. 524, 530 (1952).   Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.      *Lack of Factual Specificity in the Charges* (Ground 1)

Leonard first argues that habeas relief is warranted because the indictment failed to

provide him sufficient notice of the charges against him.   The record reflects that, prior to trial,

the defense moved for an order requiring the prosecutor to elect which specific acts (including

dates) were charged as counts 1 through 4.   The trial court denied the motion, concluding that:

1) the grand jury transcript and the police reports, which had been provided to Leonard prior to

trial, adequately notified him of the acts underlying the charges; and 2) the jury would be

instructed with California Criminal Jury Instruction No. 17.01,[3] the unanimity instruction. Leonard challenged the denial on direct appeal, which the Court of Appeal denied.

The Sixth Amendment guarantees a criminal defendant the right to be clearly informed of the nature and cause of the charges against him to allow adequate preparation of a defense. *Russell v. United* States, 369 U.S. 749, 763-64 (1962); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by the charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.").  To determine whether a defendant has received constitutionally adequate notice, a reviewing court looks first to the charging document.  *See Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007).  "[F]or purposes of AEDPA's 'clearly established law' requirement, it is 'clearly established' that a criminal defendant has a right, guaranteed by the Sixth Amendment and applied against the states through the Fourteenth Amendment, to be informed of any charges against him, and that a charging document, such as an information, is the means by which such notice is provided."  *Id.* at 1004.  The charging document must include "such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."  *United States v. Hess*, 124 U.S. 483, 487 (1888).

The United States Supreme Court has not determined that an information in a child sexual abuse case is constitutionally deficient for failure to provide specific dates of incidents.

---

[3]      That instruction provides, in relevant part, that "in order to return a verdict of guilty . . ., all jurors must agree that he committed the same acts."  CALJIC 17.01.

Some federal courts, however, have granted habeas relief in certain circumstances.  In *Valentine v. Konteh*, the Sixth Circuit held that a state court unreasonably applied Supreme Court precedent when it sustained an indictment charging the defendant with 20 identically-worded counts of child rape and 20 identically-worded counts of felonious sexual penetration alleged to have occurred over a period of 10 months.  395 F.3d 626, 629 (6th Cir. 2005).  In that case, the counts were based on the victim's description of "typical" abusive conduct and an estimation of the number of instances when that conduct occurred; no evidence offered at trial differentiated the charges.  *Id.* at 633.  The Sixth Circuit concluded that the indictment was too lacking in detail to provide the defendant notice of the charges and sufficient specificity to plead convictions or acquittals as a bar to further prosecutions.  *Id.* at 634.

But in that case, the court did not hold that the lack of specific dates rendered the information insufficient; rather it "found that fairly large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements."  *Id.* at 632, 638 (noting that "courts must be aware and responsive to the unique problems of child abuse cases"). Indeed, the federal courts that have considered claims similar to those raised by Leonard have concluded that the lack of specificity in an indictment with regard to the dates of alleged crimes of child abuse did not violate the petitioner's Sixth Amendment rights to adequate notice and an opportunity to defend.  *See Brodit v. Cambra*, 350 F.3d 985, 988-89 (9th Cir. 2003); *see Fawcett v. Bablitch*, 962 F.2d 617, 619 (7th Cir. 1992) (acknowledging that "it is hard to provide an alibi for a six-month period, or even for all the weekends during that time" but concluding that, nevertheless, defendant was not precluded from preparing a defense to charges of child abuse); *Hunter v. New Mexico*, 916 F.2d 595, 600 (10th Cir. 1990) (referencing a charging document

alleging a crime had occurred within a three-year time span). Thus, in the absence of a Supreme Court holding that generic testimony is insufficient to support a conviction for sexual abuse or that a charging document must specify the exact dates of alleged sexual abuse in order to satisfy due process, it cannot be said that the California courts' rejection of Leonard's claim either was contrary to or involved an unreasonable application of clearly established Supreme Court law. *See Carey*, 549 U.S. at 77.

Moreover, the Ninth Circuit has also held that in certain circumstances, such as when a criminal defendant argues that he received insufficient notice of a particular theory of the case, the court may examine sources other than the charging document for evidence that the defendant received adequate notice. *Gautt*, 489 F.3d at 1009; *see, e.g., Murtishaw v. Woodford*, 255 F.3d 926, 953 (9th Cir. 2001) (defendant received adequate notice of the prosecution's felony-murder theory from the prosecutor's opening statement, the evidence at trial, and the jury instructions conference); *Calderon v. Prunty*, 59 F.3d 1005, 1008 (9th Cir. 1995) (defendant received adequate notice of prosecution's lying-in-wait theory from the prosecutor's opening statement and argument at motion for acquittal); *cf. Sheppard v. Rees*, 909 F.2d 1234, 1235-37 (9th Cir. 1989) (defendant did not receive sufficient notice of felony-murder theory when the theory was never mentioned during pre-trial proceedings, opening statements, testimony, or initial jury instruction conference, and the prosecutor only sought a felony-murder instruction after the close of evidence). As the Court of Appeals concluded on direct appeal:

> In denying the election motion, the trial court reasoned, as noted, that the grand jury transcript and the police reports provided sufficient notice of the acts underlying the charges. As for his grand jury testimony, S.M. testified that the first sexual touching, which was masturbation, occurred during his first extended visit with [Leonard], which happened after S.M.'s second year at Camp Bushido. During this same visit, S.M. testified, [Leonard] put him on the floor in front of [Leonard's] bed and sodomized him,

12

and then sodomized him again in the shower.  S.M. testified more generically to several additional acts encompassing masturbation, oral copulation and sodomy during subsequent visits.  S.M. stated that [Leonard] would touch him sexually every time he visited [Leonard]; and S.M. estimated, overall, there were at least 20 to 30 acts of masturbation, 10 acts of oral copulation, and 20 to 30 acts of sodomy.

Besides this grand jury testimony, there was the pretrial discovery including the police reports of the forensic investigator and Detective Marshall.  These two reports roughly aligned with S.M.'s grand jury testimony, without providing the generic scope or number of assaults: [Leonard] first molested S.M. after the second or third year of judo camp, sodomizing him after pulling him from the bed to the floor; a second assault encompassed oral copulation and sodomy; and subsequent sexual assaults took place.

Furthermore, Detective Marshall had mother determine, using her old calendars, when S.M. visited [Leonard] during the period alleged in the indictment: July 2002 to January 2004.  This gave [Leonard] notice of discrete time periods to defend against.  And aside from the time of the offenses, [Leonard] was well acquainted with their place: It was primarily at his place; one was in S.M.'s kitchen.

As for defenses, [Leonard] was able to tender those which were available on the facts here: credibility, alibi, psychological profile, good character.  Mistaken identity was not among the viable.

Given S.M.'s grand jury testimony, the police reports, the discrete time periods, and the available defenses, we conclude the trial court did not err, on notice grounds, in denying [Leonard's] request for prosecutorial election.[3]

FN3.   We also add that, in the real world, a defendant's request for an election by the prosecutor will often be greeted by the prosecutor's cross-motion to charge additional counts.

*Leonard*, 2011 WL 1833262, at *5-6.

Because the exact times of the offenses are not material in this case and were not an element of the offense, the imprecise charges did not mislead him or violate his right to due process.  Further, the state court opinion concluding that Leonard received sufficient notice from S.M.'s grand jury testimony and the police reports is a reasonable construction of the evidence in this case and is not contrary to or an objectively unreasonable application of United States Supreme Court authority.  That evidence also reveals factual differentiation among the charges that distinguishes the instant case from *Valentine.*  Jones is thus not entitled to relief on this claim.

B.      *Juror Misconduct in Deliberations* (Ground 2)

Leonard additionally alleges that the jurors failed to follow the law in arriving at their verdict because they did not: 1) find a specific act for each count; and 2) limit themselves to the charged time period.  Leonard moved for a new trial on this ground, and in support submitted a number of juror declarations, to which the prosecution responded with additional declarations. On direct appeal, the Court of Appeal described the declarations as follows:

> (1) Juror No. 276610 stated the four counts occurred between September 2003 and February 2006; the "incidents were never broken down that a specific incident was a specific count"; and the juror could remember only that count 1 was masturbation;
> (2) Juror No. 279652 could recall only that count 1 was the masturbation and count 3 was the sodomy, and both occurred when S.M. stayed with [Leonard] following the second judo camp;
> (3) Juror No. 287216 stated the "entire 12 person jury, as a whole, never agreed what was the sexual act" that supported each of the counts; and could recall only, based on the juror's belief, that count 1 was sodomy; and
> (4) Juror No. 299667 could remember only that one of the forcible counts involved sodomy.

> The prosecution countered with eight declarations, three of which were from the defense declarants (1), (2) and (3). As pertinent:
> (1) Juror No. 276610 (also, defense declarant (1) above) stated "that the jury discussed the acts that took place, and that the acts took place during the time in question, but we did not put the acts on any specific day";
> (2) Juror No. 279652 (also, defense declarant (2) above) stated that "we decided on each specific act . . . found for each count and . . . decided unanimously. I am unable to remember each of them now";
> (3) Juror No. 287216 (also, defense declarant (3) above) now remembered that the first count involved masturbation, and stated that "[w]e talked about specific acts and agreed what they were";
> (4) and (5) Juror Nos. 279325 and 306037 both stated that the jury agreed on the four counts that fell within the timeline given, and that the jury discussed the specific sex acts and agreed as to each count "what we were finding [Leonard] guilty of";
> (6) and (7) Juror Nos. 297909 and 286507 both stated essentially that the timeline in the case was not a big issue because it was a given; and

14

(8) Juror No. 284599 could not now recall the specific counts, but remembered that one had to do with [Leonard's] forcing himself into S.M. (sodomy) while on the floor and another involved masturbation.

In rebuttal, [Leonard] submitted what was now the third declaration from Juror No. 287216, stating that "we, as the entire jury, never all agreed that a specific and discrete act supported a specific count" and "my personal opinion [now] is count [1] was sodomy [this juror's first declaration stated that count 1 was sodomy; but the second declaration stated masturbation]."

*Leonard*, 2011 WL 1833262, at *7-8.

The Court of Appeal subsequently denied the claim on direct appeal:

At the outset, we reject any contention that the jury used the wrong timeline for the offenses.  [Leonard] points to Juror No. 276610's initial declaration, for the defense, that this timeline ran from September 2003 to February 2006.  The indictment alleged that the offenses occurred between July 2002 and January 2004.  In a subsequent declaration for the People, this same juror, No. 276610, noted that the jury discussed that the acts "took place during the time in question"; and two other jurors confirmed that the timeline was not a big issue as it was a given (presumably because it was alleged in the indictment).  Against this backdrop, Juror No. 276610's lone initial statement of the timeline for the offenses appears to be a simple numerical error.

That brings us to the crux of the new trial motion-whether the jury agreed unanimously on a specific act for each count as instructed by CALJIC No. 17.01.

As the trial court found, the four defense declarations, in describing a failure to remember which act led to which count, do not establish misconduct; they establish only a failure to remember, not surprising given that over three months elapsed between when the trial ended and the declarations were made.  Indeed, we add that the stated failure to remember the acts for some counts, while remembering the acts for other counts, supports a conclusion that the jury did link certain acts with certain counts, as instructed by CALJIC No. 17.01.4.

The more pertinent defense declaration statement from Juror No. 276610 that "[t]he incidents were never broken down that a specific incident was a specific count" was stated in the context of the issue of when the offenses occurred rather than what those offenses were.  As explained in Juror No. 276610's subsequent declaration for the People, "the jury discussed the acts that took place, and that the acts took place during the time in question, but we did not put the acts on any specific day.  We all understood that as long as the act took place during the time in question, it counted."

That leaves the two defense declarations from Juror No. 287216, stating that the entire jury never agreed what sexual act comprised what count.  These statements constitute evidence of juror misconduct—i.e., a failure to follow the unanimity instruction of CALJIC No. 17.01.  But for the reasons set forth below, we agree with the trial court that the prosecution successfully countered this evidence of misconduct.

15

Juror No. 287216 also submitted a declaration for the People, sandwiched between the juror's two defense declarations, stating: "[W]e did discuss all the evidence, including specific sex acts, and how it related to the counts . . . . [¶] . . . We talked about specific acts and agreed what they were . . . . [¶] . . . [¶] . . . On the final vote the jury took, we all agreed that [Leonard] was guilty of all four counts."  Furthermore, the People submitted declarations from Juror Nos. 279325 and 306037 stating that the jury discussed the specific sex acts and "agreed as to each count what we were finding [Leonard] guilty of."  Finally, to the extent that Juror No. 287216's three declarations were inconsistent, the trial court found, and this was a credibility call for the trial court, that Juror No. 287216 seemed to be a people-pleasing person who would "continue to sign conflicting declarations for the next ten years."  In light of Juror No. 287216's succession of supporting declarations for both sides, substantial evidence supports this finding.

We conclude the trial court properly denied [Leonard's] motion for new trial alleging juror misconduct.

*Id.* at *8-9.

Criminal defendants in state trials have a right to a fair and impartial jury under the Sixth and Fourteenth Amendments.  *Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  However, in determining whether a defendant was convicted by a fair and impartial jury, Federal Rule of Evidence 606(b) limits a federal court's consideration of potential jury misconduct.[4]  That rule provides:

During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

---

[4]      The rationale for this rule is the protection of jury verdicts which "can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."  *Tanner v. United States*, 483 U.S. 107, 119-20 (1987) (citations omitted).

FED. R. EVID. 606(b).[5]

In accordance with this rule, federal courts routinely deny motions for a new trial where such requests are based on juror declarations deemed inadmissible under Rule 606(b). *See, e.g.*, *United States v. Bussell*, 414 F.3d 1048, 1054-55 (9th Cir. 2005) (agreeing with district court that juror declaration regarding juror speculation that co-defendant had pled guilty were inadmissible under Rule 606(b) and that, therefore, no evidentiary hearing or new trial was warranted); *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004) (upholding district court's denial of new trial because Rule 606(b) barred consideration of declarations stating that jurors ignored court's instructions and discussed defendant's failure to testify).

Rule 606(b) also "applies to petitions for habeas corpus from state court prisoners." *Erikson v. Rowland*, 991 F.2d 803, at *2 (9th Cir. 1993) (unpublished). Thus, federal courts have likewise consistently rejected habeas claims alleging juror misconduct where those claims depend on evidence that would be inadmissible under Rule 606(b). *See, e.g.*, *id*. at *3; *Harrison v. Gillespie*, 640 F.3d 888, 895 (9th Cir. 2011) (noting, in context of a § 2241 habeas petition, that a Court "may not consider jurors' testimony addressing the jury's deliberative process unless the testimony 'bear[s] on extraneous influences on the deliberation'"); *Estrada v. Scribner*, 512 F.3d 1227, 1237-38 (9th Cir. 2008) (affirming district court's application of Rule 606(b) to bar consideration of certain juror affidavits supporting a § 2254 habeas petitioner's juror misconduct claim). Accordingly, because Leonard has not presented admissible evidence

---

[5] The rule applies an "[e]xception[] . . . for testimony as to 'extraneous prejudicial information' brought to the attention of the jury, an improper 'outside influence' on a juror, or a mistake in completing a jury form." FED. R. EVID. 606(b). Because Leonard does not allege any extraneous information or outside influence, the exception does not apply here.

of the alleged juror misconduct, and, indeed, will necessarily be unable to do so given the nature

of the alleged misconduct, this claim must also fail on federal habeas review.  Moreover, even if

Leonard were able to present admissible evidence, "allegations that relate to 'intrinsic jury

processes' do not implicate the protections of the Sixth Amendment."  *See Hernandez v. Barnes*,

No. CV 12-01887, 2015 WL 269050, at *9 (C.D. Cal. Jan. 20, 2015) (citing *United States v.

Bagnariol*, 665 F.2d 877, 887 (9th Cir. 1981) ("Intrinsic jury processes will not be examined on

appeal and cannot support reversal.")).

  Furthermore, to the extent that Leonard's *pro se* Petition may be construed liberally, *see

Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), to raise a claim challenging the jury's

verdict for lack of unanimity, such claim also must fail.  There is no federal constitutional right

to a unanimous jury verdict in a state criminal trial.  *See Richardson v. United States*, 526 U.S.

813, 817 (1999) (federal jury need not unanimously decide which set of facts make up a

particular element of a crime); *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (plurality holding

that conviction under different theories does not violate due process); *see also McKoy v. N.

Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) ("[D]ifferent jurors may be

persuaded by different pieces of evidence, even when they agree upon the bottom line.  Plainly

there is no general requirement that the jury reach agreement on the preliminary factual issues

which underlie the verdict." (footnotes omitted)).  While a California trial court may be required

under state law mandating that a jury verdict in a criminal case be unanimous to *sua sponte*

instruct the jury that it must unanimously agree on the acts or elements underlying the offense in

order to convict, federal law is clear that, at least in a non-capital case, there is no federal right to

a unanimous jury verdict.  *Compare People v. Diedrich*, 643 P.2d 971, 980-81 (Cal. 1982) and

18

*People v. Crawford*, 182 Cal. Rptr. 536, 538 (Cal. Ct. App. 1982) (unanimity instruction

required where defendant was charged with possession of one or more firearms by felon and jury

could disagree as to particular firearm), *with Schad*, 501 U.S. at 634 n.5 ("a state criminal

defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict") and

*Apodaca v. Oregon*, 406 U.S. 404, 410-13 (1972) (no constitutional right to unanimous jury

verdict in non-capital criminal cases).  Accordingly, Leonard is not entitled to relief on this

ground.

C.       *Erroneous Admission of J.L.'s Testimony* (Ground 3)

        Leonard further asserts that the trial court erred in admitting J.L.'s testimony that

Leonard sexually molested him.

        California Evidence Code § 1108 allows the prosecution to prove a defendant's

propensity to commit sex crimes by offering evidence that he has committed other sex crimes.  It

is an exception to the general rule, reflected in § 1101, that propensity evidence is not

admissible.  *See* CAL. EVID. CODE §§ 1101(a), 1108(a).  The relevant portion of § 1108 provides:

"In a criminal action in which the defendant is accused of a sexual offense, evidence of the

defendant's commission of another sexual offense or offenses is not made inadmissible by

Section 1101, if the evidence is not inadmissible pursuant to Section 352."[6]  Section 1108 is

analogous to Federal Rule of Evidence 413, which provides that, "[i]n a criminal case in which a

---

        [6]       Section 352 allows for the exclusion of otherwise probative evidence if it will
consume unnecessary time, create the danger of undue prejudice, confuse the issues, or mislead
the jury.  CAL. EVID. CODE § 352.  Its federal counterpart, Federal Rule of Evidence 403, permits
the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . .
unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or
needlessly presenting cumulative evidence."

defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault."  FED. R. EVID. 413(a).

As an initial matter, Leonard cannot prevail on this claim because "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected."  *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987).  So, even if the trial court erred in its application of §§ 352 and 1108, such error is not a ground for federal habeas relief. *See Estelle*, 502 U.S. at 67-68.  Indeed, Leonard cannot demonstrate that the trial court committed error.  The record reflects that the trial court properly weighed the evidence against its potential to cause prejudice and instructed the jury that it may, but was not required, to infer from the evidence that he had a disposition to commit sexual offenses.

Moreover, the Ninth Circuit has repeatedly barred federal habeas petitioners from challenging the constitutionality of prior sexual misconduct evidence admitted to show propensity pursuant to California Evidence Code § 1108.  *See, e.g., Greel v. Martel*, 472 F. App'x 503, 504 (9th Cir. 2012) ("Ninth Circuit precedent 'squarely forecloses [the] argument' that admission of evidence of sexual misconduct to show propensity violates due process.") (quoting *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)); *Sanches v. Hedgpeth*, 381 F. App'x 710, 711 (9th Cir. 2010) ("[T]he Supreme Court has never held that the admission of prior sexual misconduct to lend credence to a victim's claims to be unconstitutional."); *Mejia*, 534 F.3d at 1046 (on AEDPA review, upholding admission of evidence of prior uncharged sexual offenses in support of rape charges).  In so holding, the Ninth Circuit has cited the United States Supreme Court's express refusal to decide the issue.  *See Estelle*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due

Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").  Leonard is therefore not entitled to relief on this ground.

D.    *Insufficiency of the Evidence* (Ground 4)

Finally, Leonard argues that insufficient evidence supported his conviction on all four counts because: 1) the victim's testimony was too general with respect to counts 2, 3, and 4; and 2) the victim's testimony was internally inconsistent and inherently improbable.  Leonard raised this claim on direct appeal by arguing that S.M.'s generic testimony failed to satisfy California requirements as articulated in *Jones*, 792 P.2d at 643.  The Court of Appeal rejected that contention as follows:

> Under *Jones*, supra, 51 Cal.3d 294, a child's purely "generic" testimony regarding multiple sexual molestations over a period of time constitutes sufficient evidence to support multiple convictions if the testimony describes "[(1)] *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy)[;] . . . [(2)] *the number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping') [;] . . . [and (3)] the general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period.  Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction."  (*Jones*, 51 Cal.3d at p. 316.)
>
> S.M.'s testimony, summarized in the Factual and Procedural Background of this opinion, satisfies these three criteria and includes significantly more than four sexual acts. As noted, the indictment charged defendant with a first and final incident, and a first and final incident with force, within the time frame of July 2002 to January 2004. S.M. testified to several separate sexual acts, which took place when S.M. visited defendant during this time period, and the dates of these visits were established from old calendars of S.M.'s mother. S.M. testified that [Leonard] sexually molested him every time S.M. visited, and S.M. estimated the overall numbers of each kind of sexual act.
>
> More specifically, S.M. described a masturbation act as the first incident and a sodomy as the first incident with force. S.M. testified that these took place during his first extended visit with [Leonard] following the judo camp in 2003. The prosecutor argued along these very lines in closing argument, and logically explained to the jury that

if it believed [Leonard] molested S.M. more than once and more than once with force, there were, respectively, first and final incidents in these two respects.  The jury was instructed that it must agree unanimously as to each act for each count, and, as explained in part II of this opinion, substantial evidence shows the jury did so.

　　　Furthermore, S.M.'s statements to law enforcement, as well as the pretext phone calls and the searches of [Leonard's] residence, corroborated S.M.'s testimony and provided further evidence of [Leonard's] guilt.  We conclude that S.M.'s generic testimony constituted sufficient evidence under the *Jones* standard.

*Leonard*, 2011 WL 1833262, at *10-11.

Leonard alternatively argued that the evidence was insufficient because it was inherently improbable.  The Court of Appeals disagreed:

　　　[Leonard] has misperceived the principle of inherent improbability.  [Leonard] argues, for example, that S.M.'s testimony that he told Detective Marshall the sexual molestation began after the 2002 judo camp was inherently improbable because S.M. also testified the molestation first occurred after the 2003 judo camp; and that the sexual incidents S.M. described when his mother and brother were also visiting [Leonard] were inherently improbable because the bedrooms were near one another and the floors creaked.  But these examples are not examples of inherent improbability.  Inherent improbability does not encompass testimonial inconsistencies or contradictions, or unusual circumstances; instead, the term means unbelievable on its face or physically impossible.

*Id.* at *11 (citation omitted).

Leonard again argues before this Court that S.M.'s testimony was legally insufficient to support his convictions.  As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role

of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the

ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."
*Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the
responsibility of the jury—not the court—to decide what conclusions should be drawn from
evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state
court decision rejecting a sufficiency of the evidence challenge simply because the federal court
disagrees with the state court. The federal court instead may do so only if the state court
decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773
(2010)).

Leonard contends that holes in S.M.'s testimony created too much doubt to sustain his
convictions. But Leonard's arguments simply point out inconsistencies in the evidence before
the jury and attack the credibility of S.M. This Court is precluded, however, from either re-
weighing the evidence or assessing the credibility of witnesses. *Schlup v. Delo*, 513 U.S 298,
330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). All of the evidence and
testimony he identifies in support of his claim was before the jury for its assessment. Although it
might have been possible to draw a different inference from the totality of the evidence, this
Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at
326.

Indeed, it is well-settled that the testimony of even a single witness is sufficient to
support a conviction under the *Jackson* standard. *See Bruce*, 376 F.3d at 957-58; *see also United
States v. McClendon*, 782 F.2d 785, 790 (9th Cir. 1986). And as the Court of Appeal stated,
"S.M.'s statements to law enforcement, as well as the pretext phone calls and the searches of
[Leonard's] residence, corroborated S.M.'s testimony and provided further evidence of

[Leonard's] guilt." *Leonard*, 2011 WL 1833262, at *11.  A reasonable jury could have determined from that testimony and the corroborating evidence that Leonard committed the crimes with which he was charged.  Viewing that evidence in the light most favorable to the verdict, the record does not compel the conclusion that no rational trier of fact could have found proof of Leonard's guilt.  Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt that Leonard was guilty of the charged sexual offenses, and Leonard cannot prevail on this claim.

## V. CONCLUSION AND ORDER

Leonard is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 9, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

26